DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Jeffrey Fletcher, appeals his conviction out of the Summit County Court of Common Pleas. This Court affirms.
 I. {¶ 2} On May 8, 2007, Fletcher was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(1) and (2), a felony of the second degree, with a firearm specification in violation of R.C. 2941.145; one count of intimidation of crime victim or witness in violation of R.C. 2921.04(B), a felony of the third degree; and one count of domestic violence in violation of R.C. 2919.25(A), a misdemeanor of the first degree. Fletcher pled not guilty to the charges, and the matter was scheduled for trial.
 {¶ 3} At the conclusion of trial, the jury found Fletcher guilty of felonious assault, the attending gun specification and domestic violence. The jury found Fletcher not guilty of *Page 2 
intimidation. The trial court sentenced Fletcher accordingly. Fletcher timely appealed, raising two assignments of error for review.
 II. ASSIGNMENT OF ERROR I "APPELLANT'S CONVICTIONS WERE BASED UPON INSUFFICIENT EVIDENCE AS A MATTER OF LAW, AND WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 4} Fletcher argues that his convictions for felonious assault and domestic violence were not supported by sufficient evidence and were against the weight of the evidence. Specifically, he argues that the State failed to prove that he acted with the requisite culpable mental state, i.e., that he acted knowingly. This Court disagrees.
 {¶ 5} A review of the sufficiency of the State's evidence and the manifest weight of the evidence adduced at trial are "separate and legally distinct determinations." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." Id., citing State v. Thompkins (1997),78 Ohio St.3d 380, 390 (Cook J., concurring). When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction.State v. Jenks (1991), 61 Ohio St.3d 259, 279.
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citation omitted.) Id. at paragraph two of the syllabus. *Page 3 
 {¶ 6} A determination of whether a conviction is against the manifest weight of the evidence, however, does not permit this Court to view the evidence in the light most favorable to the State to determine whether the State has met its burden of persuasion. State v. Love, 9th Dist. No. 21654, 2004-Ohio-1422, at ¶ 11. Rather,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 7} This Court has stated that "[sufficiency is required to take a case to the jury[.] * * * Thus, a determination that [a] conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Emphasis omitted.) State v. Roberts (Sept. 17, 1997), 9th Dist. No. 96CA006462.
 {¶ 8} As a preliminary matter, this Court addresses the State's argument that Fletcher's challenge to his domestic violence conviction is moot because he has already served his sentence. The State relied on our decision in State v. Parker, 9th Dist. No. 23303, 2007-Ohio-960, in which this Court declined to address the defendant's challenge to his sentence for criminal damaging or endangering, a misdemeanor of the second degree, because he had already served his sentence. Id. at ¶ 11. This Court reasoned that the defendant would not suffer any collateral disability or loss of civil rights from that conviction. Id. at ¶ 13. This case, however, is distinguishable from Parker.
 {¶ 9} The Ohio Supreme Court, within the context of a misdemeanor offense, has held:
 "Where a defendant, convicted of a criminal offense, has voluntarily paid the fine or completed the sentence for that offense, an appeal is moot when no evidence is offered from which an inference can be drawn that the defendant will suffer some collateral disability or loss of civil rights from such judgment or conviction." *Page 4 State v. Berndt (1987), 29 Ohio St.3d 3, 4, quoting State v. Wilson (1975), 41 Ohio St.2d 236, syllabus.
In Berndt, the defendant was convicted of operating a motor vehicle while under the influence of alcohol. Although the defendant argued that he would suffer a collateral disability because that conviction would enhance his penalty if he were subsequently convicted of the same offense, the high court found that the possibility of a future enhanced penalty was not a collateral disability because no disability would exist so long as the defendant "remained] within the confines of the law." Id. at 4-5.
 {¶ 10} In 2007, the Ohio Supreme Court issued a decision, distinguishing Berndt. In re S.J.K., 114 Ohio St.3d 23, 2007-Ohio-2621.S.J.K. involved a juvenile who had been adjudicated a juvenile traffic offender. His disposition included the imposition of points on his driver's license, which he argued constituted a collateral disability because the points would affect his insurability and the cost of insurance in the future. Id. at ¶ 10. The Supreme Court defined a collateral disability as "an adverse legal consequence of a conviction or judgment that survives despite the court's sentence having been satisfied or served." Id., citing Pollard v. United States (1957),352 U.S. 354. In finding that the juvenile had substantiated the existence of a collateral disability, the S.J.K. court stated:
 "Depending upon the existing number of points on a person's driving record, an additional four points may even result in the suspension of a person's driver's license when 12 or more points are accumulated within a two-year period. R.C. 4510.037(B). The points may also increase the severity of future penalties, raise insurance rates, or impair the ability to obtain insurance. Thus, the imposition of points is a penalty that constitutes a collateral disability flowing from a conviction for a traffic offense." Id. at ¶ 13.
 {¶ 11} "[A] collateral disability need not have an immediate impact or impairment but may be something that occurs in the future." Id at ¶ 14, citing Evitts v. Lucey (1985), 469 U.S. 387, 391. Fletcher has argued that his current conviction for domestic violence will subject him *Page 5 
to some collateral disability because he will be prohibited from owning or possessing a firearm in the future.[1] See 18 U.S.C. 922(g)(9). Accordingly, he has established the existence of a collateral disability as a result of his misdemeanor domestic violence conviction. Therefore, although he has served the sentence imposed for his domestic violence conviction, the conviction is not moot; and this Court will address his challenge to it.
 {¶ 12} Fletcher was convicted of felonious assault in violation of R.C. 2903.11(A), which states, in relevant part:
 "No person shall knowingly do either of the following:
 "(1) Cause serious physical harm to another * * *;
 "(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(1) and (2).
 {¶ 13} He was also convicted of domestic violence in violation of R.C. 2919.25(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."
 {¶ 14} R.C. 2901.22(B) states:
 "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 15} The victim, Linda Weaver, testified that she and Fletcher had been living together for two to three years in his home at the time of these incidents on August 30, 2006. Although she and Fletcher had had a romantic relationship, she testified that the two were not getting along *Page 6 
and had been sleeping apart in Fletcher's home for the six months preceding these incidents. Ms. Weaver continued to testify as follows.
 {¶ 16} Ms. Weaver got up at 5:00 a.m. on August 30, 2006, because she had to cover a shift for a co-worker. She passed Fletcher, who was sleeping on the couch in the living room, on her way to the kitchen to make coffee. In order to use the coffeepot, she moved a pizza box and threw it on the floor beside the full trash can. At the sound of that, Fletcher jumped up from the couch and ran toward the kitchen and began chastising her for her behavior. Fletcher told Ms. Weaver that she could no longer stay in his home unless she started paying rent. Ms. Weaver then asked Fletcher to repay her $300.00 she had lent him. When he told her that she would never see that money, Ms. Weaver walked to the stereo in the living room, began playing with the buttons on the stereo, and commented that she was sure she could get $300.00 for the stereo. Ms. Weaver admitted that she was trying to irritate Fletcher because she had not had any coffee yet that morning and she needed to get to work.
 {¶ 17} Ms. Weaver testified that Fletcher then grabbed her by the chin and head and "snapped" her neck, which made an audible "pop" and caused her "an incredible amount of pain." She testified that Fletcher's actions caused her body to spin around and hit a DVD/CD tower near the stereo. She testified that as she began falling down, Fletcher hit her with his forearms in her head and shoulders. Ms. Weaver testified that Fletcher looked at the tower on the floor and began to yell at her for knocking it over. She testified that he then threatened to destroy her laptop computer. Fletcher began to move in the direction of her bedroom, watching her as he did so. Ms. Weaver testified that she decided not to try to stop him because past violent experiences with him made her think that her interference would only escalate the situation. *Page 7 
 {¶ 18} Ms. Weaver testified that she pulled herself to her feet and turned towards the door, intending to let Fletcher do whatever he was going to do to her computer. She testified that Fletcher approached her and twisted her neck a second time, causing her to again fall to the floor. She testified that she picked herself up, turned and fell onto the couch. She testified that there was a .45 caliber handgun nearby on the coffee table. She testified that she picked up the gun and began to wave it at Fletcher so that he would not continue to hurt her.
 {¶ 19} Ms. Weaver testified that Fletcher ran towards her and began twisting the gun out of her hands. She ended up lying on the couch with her feet on the ground as he continued to twist the gun from her grip. Ms. Weaver testified that Fletcher wrestled the gun from her hands, stepped back, and fiddled with the gun as though he was trying to turn the safety off. She testified that Fletcher put the gun to her chest, stepped back and "fiddle[d]" with the gun, put the gun to her chest again, then stepped back again. Ms. Weaver testified that, after that back and forth, Fletcher discharged the gun as he stood back from her. She testified that she immediately sat up as the bullet entered her. She testified that Fletcher picked up her shirt in the back and told her to get up. She testified that she stumbled as she tried to stand, and she fell into the couch.
 {¶ 20} Ms. Weaver identified the .45 caliber handgun taken from Fletcher's home as the weapon he used to shoot her. She testified that Fletcher kept several high-powered firearms in his home and that he "religiously keeps the safeties on all his guns[.]" She testified that she did not turn off the safety mechanism on the .45 at any time.
 {¶ 21} Ms. Weaver testified that Fletcher placed the gun on the back of the couch, then picked her up and took her outside to his truck, where he dropped her in the dirt. She testified that she was unable to get up despite Fletcher's orders that she do so. She testified that he picked *Page 8 
her up and put her in the truck and drove her to the hospital. Ms. Weaver testified that when they arrived at the hospital, Fletcher yelled, "gunshot victim." Hospital personnel pulled her out of the truck and took her into the hospital. She testified that Fletcher did not go inside the hospital with her.
 {¶ 22} Ms. Weaver testified that Fletcher visited her quite often during her week-long hospital stay. She testified that he threatened her repeatedly and told her to tell people that the shooting was an accident. She testified that she initially told the police that she was accidentally shot during a struggle, but after she had been moved to another room where she felt safe, she told the police that Fletcher's discharge of the gun was not an accident. Ms. Weaver testified that Fletcher admitted to her during one of his threatening conversations, "I had to take the safety off the gun in order to shoot you."
 {¶ 23} Detective Anthony Sutton of the Akron Police Department ("APD") testified that on August 30, 2006, he responded to Akron General Medical Center on a call regarding a victim with a gunshot wound. He testified that hospital personnel informed him that the victim had been dropped off by Fletcher. Detective Sutton testified that he questioned Fletcher when Fletcher returned to the hospital.
 {¶ 24} Detective Sutton testified that Fletcher told him that he was on his front porch when he heard a gunshot. He testified that Fletcher told him the following. When he ran back into the house, he saw Ms. Weaver sitting on the couch. He scanned the room for bullet holes, then lifted Ms. Weaver's shirt and saw a blue bruise on her lower back. Fletcher picked her up and rushed her to the hospital. Fletcher then returned home to secure his house and bring in his dogs. Detective Sutton testified that Fletcher's demeanor changed from "aggressive" to tearful and back during their encounter, depending on whether or not Fletcher thought the police had *Page 9 
spoken with the victim. The detective testified that Fletcher asked him whether he had spoken with Ms. Weaver and whether she was able to talk. Detective Sutton testified that Fletcher asked repeatedly if he could wash his hands. Fletcher told him that his hands were dirty from playing with his dogs and putting them back inside his house. Fletcher was permitted to wash his hands.
 {¶ 25} Detective Sutton testified that Fletcher told him that Ms. Weaver had tried to kill herself. The detective testified that Fletcher never mentioned a struggle. He testified that Fletcher told him that Ms. Weaver would not have accidentally shot herself because there was no reason to play with weapons which were accessible throughout the house.
 {¶ 26} Finally, Detective Sutton testified that he stopped Fletcher several months later during a traffic stop. He testified that Fletcher did not recognize him at that time. When the detective commented about the pending trial, Fletcher told him that he was planning to plead self-defense.
 {¶ 27} Detective Michael Shaeffer of the APD testified that he too responded on August 30, 2006, to the hospital regarding a gunshot victim. While at the hospital, Detective Shaeffer performed a gunshot residue test on the victim, while Detective Hudnall and Sergeant McLeod performed one on Fletcher. He testified that he questioned Fletcher, who first told him a story similar to the one he told Detective Sutton. The detective testified, however, that Fletcher told him that the shooting had to have been an accident because Ms. Weaver "wouldn't do that to herself." The detective testified that he asked Fletcher to tell him again what happened. He testified that this time Fletcher told him that he heard a gunshot as he was walking out from the basement, not the front porch. The detective testified that, while Fletcher did not mention the gun in their first discussion, in the second discussion Fletcher said that he saw the gun in Ms. Weaver's right hand and he took it and moved it to the coffee table. The detective testified that *Page 10 
he had a third discussion with Fletcher about ten minutes later, in which Fletcher changed his statement and said that he and Ms. Weaver were arguing about money, that she grabbed the gun, he tried to take it from her and it went off. The detective testified that Fletcher refused to elaborate further.
 {¶ 28} Detective Shaeffer testified that he later accompanied the Crime Scene Unit to Fletcher's house to process the scene. He testified that Fletcher let the police into his home after he took a couple minutes to secure his dogs in a back room. The detective testified that Fletcher told the police at the scene that his dogs had knocked over the DVD/CD tower as they were trying to reach a stuffed animal. Detective Shaeffer testified that there was a stuffed animal nearby but that it did not appear wet as though played with by dogs. The detective testified that there was a Hi-Point .45 handgun, with the magazine removed and placed on top, on the headrest of the couch.
 {¶ 29} Detective Shaeffer testified that he later questioned Ms. Weaver, as well as the father of Ms. Weaver's children with whom Ms. Weaver had reconciled. The father told the detective that Ms. Weaver was a born-again Christian who would never attempt suicide. The detective testified that Ms. Weaver was intubated during their discussion, but she wrote that she did not shoot herself. She wrote "accident" and "struggle." Detective Shaeffer testified that, in his experience, he has never seen a self-inflicted accidental shooting where the victim was shot in the torso, as Ms. Weaver was.
 {¶ 30} Detective Shaeffer testified that he questioned Ms. Weaver two additional times. He testified that in those interviews the victim changed her statement and reported that she and Fletcher struggled for the gun and that Fletcher took it away from her and shot her. The detective testified that Ms. Weaver told him that she was sure that Fletcher purposely shot her *Page 11 
because she had not taken the safety off the gun, and he had to do so in order to shoot her. The detective testified that Ms. Weaver told him the incident started as she and Fletcher were arguing about money, and that the argument turned physical as Fletcher grabbed her and "snapped" her neck. Ms. Weaver told the detective that she grabbed the gun, planning to fire it at the fish tank to distract Fletcher or fire it elsewhere so the neighbors would hear it and Fletcher would stop attacking her.
 {¶ 31} Detective Shaeffer testified that Ms. Weaver told him that Fletcher came to visit her in the hospital and that she felt threatened by him. The detective testified that Fletcher was irritating hospital staff by his insistence on seeing Ms. Weaver. The detective told the staff that Fletcher should not have visitation rights with the victim because the police had not ruled him out as a suspect.
 {¶ 32} Finally, Detective Shaeffer testified that, based on his knowledge and belief, it would have been impossible for the victim to have shot herself in the manner in which she was shot. He further opined that, based on the angle that the bullet entered her body, the gun would have been discharged by "someone standing at an angle towards her."
 {¶ 33} Officer Kevin Davis of the APD testified that he is the primary instructor for the APD's use-of-force training. The trial court qualified him as an expert in the use of force, weapons and defensive tactics. Officer Davis testified that he reviewed all the evidence in this case, including the .45 caliber firearm used to shoot Ms. Weaver. He testified that the .45 has a safety mechanism which prevents firing even when the trigger is pulled when the pistol is on safe. He testified that the gun also has a magazine disconnect which prevents firing unless the magazine is in place. *Page 12 
 {¶ 34} Officer Davis testified that it is easy to track the trajectory of a .45 caliber round. He testified that he performed tests with a similar weapon, firing at a tee shirt from different ranges. He explained that a gunshot blast leaves stippling, or a pattern of residue, on a victim's skin and clothing. Based on his experience and investigation, Officer Davis opined that it would have been very difficult for Ms. Weaver to have caused a self-inflicted wound where the bullet entered the right side of her chest and traveled at an angle downwards, lodging in her lower right torso.
 {¶ 35} Officer Davis testified that the firearm used to shoot Ms. Weaver is a large, 2-pound pistol. He testified that it would be harder for a smaller person, especially a female, to fire the gun at all.[2]
Further, based on the residue tests he performed with a similar weapon, he opined that the lack of residue on the victim's clothing indicated that the gun muzzle was in excess of one foot from her body when she was shot. In fact, he testified that there was no apparent muzzle blast on Ms. Weaver's blouse. Officer Davis testified that it is easier to disarm a person holding a larger weapon. He further testified that, while a gun may discharge during a struggle over the weapon, in the course of disarming, the muzzle would necessarily be aimed upwards rather than downwards. In addition, he testified that there was no evidence that Ms. Weaver suffered any injury to her trigger finger. He testified that he would expect a serious injury, including fracture, to the trigger finger as someone else attempts to disarm another.
 {¶ 36} Officer Davis testified as to several opinions within his capacity as an expert. He opined that there was no indication that the .45 caliber pistol used to shoot Ms. Weaver malfunctioned in any way. He opined that it was highly probable that Ms. Weaver was shot after *Page 13 
she was disarmed and from a distance in excess of one foot. In conclusion, he opined that it was highly unlikely that Ms. Weaver's wound was self-inflicted.
 {¶ 37} The parties stipulated that Martin Lewis of the Ohio Attorney General's Office, Bureau of Criminal Identification and Investigation ("BCI") is an expert in forensic science, specifically trace evidence. Mr. Lewis testified that he analyzed the gunshot residue tests submitted in this case. He concluded that there was gunshot residue present on both the right and left hands of both Fletcher and Ms. Weaver. He testified that there are only three reasons why someone's hands would test positive for gunshot residue, to wit: 1) the person discharged a firearm; 2) the person was in close proximity to a firearm which discharged; or 3) the person came into contact with something covered with gunshot residue, for example, a discharged firearm. He testified that gunshot residue dissipates within 4-6 hours through normal activity.
 {¶ 38} The parties stipulated that Jonathan Gardner of BCI is an expert in the field of firearms and their operability. He inspected the .45 caliber handgun found at the scene. He opined that the gun was operable and functioned as designed. He opined that the fired cartridge casing found at the scene was fired from Fletcher's gun, and the bullet removed from Ms. Weaver was fired from that same weapon. He testified that there are three primary safeties on Fletcher's gun, to wit: 1) an external thumb safety switch, which blocks the firing pin from firing; 2) a magazine safety which requires insertion of the magazine before the gun will discharge; and 3) an internal disconnect safety which disconnects the firearm if the trigger is not pulled. Mr. Gardner admitted that the preferred method of conducting a distance test is to test the specific gun and ammunition used, rather than a similar weapon and ammunition.
 {¶ 39} Donald Frost of the APD Crime Scene Unit testified that he was called to Fletcher's home on August 30, 2006, to investigate a shooting. He testified that he took *Page 14 
photographs of the scene, which were admitted into evidence. He testified that a .45 caliber handgun, with the magazine removed and placed on top, was lying on the back of the couch in the living room. He testified that he "safed" the handgun by removing a live round from the gun's chamber. He further identified a spent casing found between the cushions of the couch.
 {¶ 40} Detective Terrence Hudnall, supervisor in the APD's Crimes Against Persons Unit, testified that he spoke with Fletcher at the hospital about the shooting. He testified that Fletcher seemed very nervous, but reluctantly consented to a gunshot residue test. He testified that Fletcher told him that he had handled the firearm but had not fired it. Detective Hudnall further testified that Fletcher told him that he was standing outside on his front porch when he heard a gunshot. He testified that Fletcher said he went inside and saw Ms. Weaver sitting on the couch. Fletcher told him that Ms. Weaver appeared wobbly as she tried to stand, so he had her sit. Fletcher told him he looked around, saw a nearby gun, moved it to either the couch or kitchen, and checked over Ms. Weaver, noticing a dark bruise on her back. Detective Hudnall testified that Fletcher told him he took Ms. Weaver to the hospital and returned home to care for his dogs. The detective testified that Fletcher expressly denied having had any argument with Ms. Weaver.
 {¶ 41} Detective Hudnall testified that he accompanied other police officers to the scene to investigate. He testified that Fletcher spent 3-4 minutes securing his dogs before he let the law enforcement officials inside his home. He testified that Fletcher was "jittery" while the police investigated at the scene. Detective Hudnall testified that when he questioned Fletcher about the overturned DVD/CD tower, Fletcher told him the dogs must have knocked it over.
 {¶ 42} Mark Lebus, a patient representative at Akron General Medical Center, testified that he was in Ms. Weaver's hospital room once when Fletcher was visiting her. He testified *Page 15 
that, as he was asking Ms. Weaver questions to screen her for benefits, Fletcher attempted to answer everything on her behalf. Mr. Lebus testified that the father of Ms. Weaver's children entered the room, and Fletcher became agitated, "stormed out of the room," then returned and yelled at Ms. Weaver to get her possessions from his home. Mr. Lebus testified that Fletcher told Ms. Weaver that if anyone else came to pick up her possessions, "then they would also end up [in the hospital]."
 {¶ 43} Dr. Robert Marley testified that he treated Ms. Weaver at Akron General Medical Center for her gunshot wound. He testified that the history of how she obtained the gunshot wound was questionable. He testified that the patient's boyfriend reported Ms. Weaver was handling a gun when it fired and hit her in the right chest. Dr. Marley testified that the bullet entered Ms. Weaver below the right nipple and lodged in her lower right flank. Dr. Marley testified that Ms. Weaver's medical records contain a note by a social worker that Ms. Weaver did not want to see Jeffrey Fletcher, identified as her boyfriend.
 {¶ 44} The defendant's father, Sylvester Fletcher, testified on behalf of his son. He testified that Ms. Weaver called his cell phone at some time after the incident and told him that it was a "stupid accident" and her fault. He testified that she asked where Fletcher was and he told her that his son was working. He testified that Ms. Weaver had never before contacted him for any reason, and that he did not know how she got his cell phone number.
 {¶ 45} Mr. Fletcher testified that he learned of the incident when his son called him on August 30, 2006, or the next day. He testified that Fletcher told him that Ms. Weaver "got shot" as "they rassled over the gun."
 {¶ 46} Jeffrey Fletcher testified in his own defense. He testified that Ms. Weaver moved in with him at his Leighton Avenue, Akron, Ohio home within six months of their meeting. He *Page 16 
testified that they had an intimate romantic relationship for more than two years, but that they later stopped getting along and Ms. Weaver began sleeping in a spare bedroom.
 {¶ 47} Fletcher testified regarding the incident as follows. On August 30, 2006, he was sleeping on the couch, when Ms. Weaver came in and said something to him which awakened him. Ms. Weaver went into the kitchen and picked up a Chinese dinner from the counter and threw it on the floor. Fletcher walked into the kitchen and told her not to throw food. Ms. Weaver asked him if he wanted her to leave and he told her just not to throw food around the house. Ms. Weaver asked him for the $300.00 he owed her and he told her he would get it for her soon. Because Ms. Weaver was not satisfied with this response, she began jerking wires out of the stereo in the living room. As she pulled on the wires, she accidentally knocked over the DVD/CD tower. Fletcher watched as Ms. Weaver tried to lift the amplifier but dropped it because of its weight. Fletcher then walked over to Ms. Weaver and stuck out his arm and pushed her back. As he did so, Ms. Weaver tripped over a stuffed animal lying on the floor. Ms. Weaver became irate, walked to the couch, picked up a .45 semi-automatic pistol and pointed it at Fletcher.
 {¶ 48} Fletcher continued to testify as follows. Ms. Weaver knew the weapon was loaded because Fletcher had had many discussions with her regarding his firearms. Fletcher saw Ms. Weaver's trigger finger get "fatter" and he realized she had squeezed the trigger in an attempt to fire the gun. Realizing he had to act, Fletcher rushed toward Ms. Weaver, grabbed hold of the gun and tried to wrestle it away from Ms. Weaver. Fletcher pointed the gun upwards. Ms. Weaver fell back on the couch, pulling the gun towards her, and the gun discharged from about a foot away from Ms. Weaver. Fletcher had one hand on the gun, while Ms. Weaver had both hands on it. Not thinking Ms. Weaver was hit, Fletcher looked around for a bullet hole, *Page 17 
concerned that the gun had been discharged through his house into a neighbor's house. Not seeing any bullet hole and noticing that Ms. Weaver had fallen over on the couch, Fletcher lifted her shirt and saw a blue bruise on her back. He placed the gun on the couch but denied removing the magazine.
 {¶ 49} Fletcher continued to testify as follows. Not seeing any blood but believing that something must be wrong with Ms. Weaver, who could not stand, Fletcher carried her to his truck and drove her to the hospital. At the hospital, Fletcher yelled that he had a gunshot victim. While hospital personnel attended to Ms. Weaver, Fletcher left to secure the dogs he was certain had run out of the house as he left with Ms. Weaver. At home, he detached the trailer which was on his truck and he hurried back to the hospital. At the hospital, law enforcement personnel began to question him about the incident.
 {¶ 50} Fletcher admitted that his prior statements to the police did not mirror his current version of the events. He testified that Ms. Weaver told him for the first time on the way to the hospital that she was a felon, and he decided to tell the police the incident was an accident because he did not want to cause her any trouble. Although he maintained that he concocted different variations of the story to protect Ms. Weaver, he admitted that all versions put her in possession of the firearm.
 {¶ 51} Fletcher addressed the alleged threats he made to Ms. Weaver in the hospital. He testified that he never made any comments about her cheating on him, but he admitted that he told her if anyone else came to pick up her belongings, that person would wind up in the hospital too.
 {¶ 52} Although there was some conflicting evidence in this case, this Court will not disturb the jury's factual determinations because the jury is in the best position to determine the *Page 18 
credibility of the witnesses during trial. State v. Crowe, 9th Dist. No. 04CA0098-M, 2005-Ohio-4082, at ¶ 22. In addition, this Court will not overturn the trial court's verdict on a manifest weight of the evidence challenge only because the jury chose to believe certain witnesses' testimony over the testimony of others. Id.
 {¶ 53} Based on a thorough review of the record, this Court finds that this is not the exceptional case, where the evidence weighs heavily in favor of Fletcher. A thorough review of the record compels this Court to find no indication that the jury lost its way and committed a manifest miscarriage of justice in convicting Fletcher of felonious assault and domestic violence. The weight of the evidence supports the conclusion that Fletcher grabbed Ms. Weaver by the head and chin and twisted her neck until it "popped," causing her an "incredible" amount of pain. The weight of the evidence further supports the conclusion that Fletcher hit Ms. Weaver about her head and shoulders. Accordingly, Fletcher's conviction for domestic violence is not against the manifest weight of the evidence.
 {¶ 54} Further, the weight of the evidence supports the conclusion that Fletcher wrestled the .45 caliber pistol away from Ms. Weaver, disengaged the safety, and fired a bullet downward into her chest as she sat on the couch a foot away. Several experts testified that, based on the location of the wound and the trajectory of the bullet through her body, Ms. Weaver's injury was not self-inflicted. Rather, the nature of the wound indicated that Ms. Weaver was shot from above at a distance of approximately one foot. Accordingly, Fletcher's conviction for felonious assault is not against the manifest weight of the evidence. Having found that Fletcher's convictions are not against the weight of the evidence, this Court further necessarily finds that there was sufficient evidence to support the jury's verdicts. Fletcher's first assignment of error is overruled. *Page 19 
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ALLOWING OTHER ACTS EVIDENCE WITHOUT ANY BASIS, AND IN FAILING TO INSTRUCT THE JURY ABOUT THE LIMITED PURPOSE OF SUCH EVIDENCE."
 {¶ 55} Fletcher argues that the trial court abused its discretion by admitting other acts evidence without any basis and in failing to give a limiting instruction to the jury regarding the purpose of such evidence. This Court disagrees.
 {¶ 56} The decision to admit or exclude evidence lies in the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173,180. This Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. An abuse of discretion demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 621. When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. Id.
 {¶ 57} Evid. R. 404(B), which addresses other crimes, wrongs or acts, states:
 "Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 58} Fletcher challenges the trial court's admission of other acts evidence arising out of three prior incidents, to wit: 1) an incident where Fletcher threw Ms. Weaver down on the concrete in response to her having wet him from the knees down with the hose after he had soaked her from head to toe; 2) an incident where Fletcher grabbed Ms. Weaver by the throat and *Page 20 
pushed her up against the wall in response to her demanding that he listen to what she had to say; and 3) an incident involving his beating his dogs. The trial court sustained an objection to the testimony regarding the incident with the dogs.
 {¶ 59} After Ms. Weaver described the hose incident, the State inquired, "Was there another incident?" Ms. Weaver described the second incident when Fletcher grabbed her by the throat, and then immediately began to discuss an incident regarding Fletcher's dogs. Defense counsel objected and the trial court sustained the objection. The trial court earlier instructed the jury:
 "Let me talk to you a second about objections. If a question is asked and an objection to the question is sustained, you will then not hear the answer and you must not speculate as to what the answer might have been or as to the reason for the objection."
 {¶ 60} This Court has stated that "[i]t is presumed that the jury will obey the trial court's instructions." State v. Warren (May 26, 1993), 9th Dist. No. 16034, citing State v. Manor (May 30, 1990), 9th Dist. No. 14376; State v. Dunkins (1983), 10 Ohio App.3d 72, 73. As Ms. Weaver was not able to elaborate on the dog incident, it is presumed that the jury followed the trial court's instruction and did not speculate as to the details of that incident.
 {¶ 61} Further, Fletcher did not request that the trial court give any limiting or cautionary instruction to the jury. "He thus waived any right to challenge the trial court's failure to give a cautionary instruction except to the extent that that failure constituted plain error." State v. Reynolds (July 10, 1996), 9th Dist. No. 16845, citingState v. Loza (1994), 71 Ohio St.3d 61, 78, certiorari denied (1995),514 U.S. 1120. This Court has most recently held that the failure to object to the alleged error "results in a forfeiture of the objection and limits any claim of error on appeal to `plain errors or defects affecting substantial rights.'" State v. White, 9th Dist. Nos. 23955, 23959, 2008-Ohio-2432, at ¶ 33, quoting State v. Payne,114 Ohio St.3d 502, 2007-Ohio-4642, *Page 21 
at ¶ 15-17 and Crim. R. 52(B). Significantly, this Court added, "Yet, this Court will not construct a claim of plain error on behalf of an appellant who fails to raise such an argument in [his] brief."White at ¶ 33, citing State v. Hairston, 9th Dist. No. 05CA008768,2006-Ohio-4925, at ¶ 11 and App. R. 16(A)(7). Fletcher did not request a cautionary instruction and did not object to the trial court's failure to give such an instruction to the jury. Furthermore, he has not argued plain error on appeal. Accordingly, we decline to address his argument that the trial court erred by failing to give a limiting instruction.
 {¶ 62} In regard to Ms. Weaver's testimony regarding the first two incidents, the trial court did not abuse its discretion by admitting such testimony. First, while Fletcher objected to Ms. Weaver's testimony that she knows Fletcher to be a violent person based on her personal experience, any specific grounds for such objection were stated in a side-bar discussion off the record. Accordingly, this Court has no knowledge of the basis for his objection. As Ms. Weaver later testified regarding the hose incident and choking incident, Fletcher did not object. Accordingly, there is some question regarding whether he in fact preserved this issue for appeal.
 {¶ 63} Assuming arguendo that his initial vague objection preserved the issue, the trial court did not abuse its discretion by admitting the testimony. This Court has held that "`prior bad acts by a defendant against the same victim are * * * admissible in domestic violence cases to prove the defendant's intent * * *." State v. Blonski (1997),125 Ohio App.3d 103, 113, quoting State v. Johnson (1994), 73 Ohio Misc.2d 1, 3. This Court clarified, however, that "when using `other acts' evidence to show the defendant's intent, the offense for which the defendant is being tried and the other act must have occurred reasonably near to each other and a similar scheme, plan, or system must have been utilized to commit the offense at issue and the other offenses." Blonski,125 Ohio App.3d at 113, citing State v. Elliot (1993), 91 Ohio App.3d 763, 771. *Page 22 
 {¶ 64} In this case, both Fletcher and Ms. Weaver testified that their relationship had soured only in the past six months prior to the instant incident. Ms. Weaver was the same victim in both the instant domestic violence incident and the prior incidents. In the prior incidents, Fletcher used physical violence against Ms. Weaver in retaliation for something she had done to him. In this case, he used physical violence in retaliation for her pulling wires out of his stereo. In one case, he grabbed her by the neck and pushed her into a wall. In this case, he grabbed her by the head and severely twisted her neck. In the other case, he threw her on the concrete. In this case, he threw her to the ground after he carried her to his truck. In this way, a similar scheme, plan, or system was utilized to commit both the instant offense of domestic violence and the other offenses.
 {¶ 65} Finally, during cross-examination of the victim, defense counsel countered Ms. Weaver's statement that Fletcher was "threatening my life and the life of my family" by stating, "And I guess you want us to believe that based on some prior history here that we have in which you've termed as violent conduct." In this way, Fletcher himself through his attorney referenced the other acts he now seeks to exclude. Under these circumstances, the other acts evidence was admissible and the trial court did not abuse its discretion by admitting it. Fletcher's second assignment of error is overruled.
 III. {¶ 66} Fletcher's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
 Judgment affirmed. *Page 23 
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
SLABY, J. DICKINSON, J. CONCUR
[1] The evidence in this case shows that Fletcher owns several firearms for protection.
[2] Ms. Weaver testified that she is approximately 5'7'' and 113 pounds. *Page 1